[Civ. No. 17093.   Second Dist., Div. Two.   Apr. 26, 1950.]

Estate of JOHN S. COOPER, Deceased.   MABEL J. COOPER, Appellant, v. GRACE ZERBE COOPER, Respondent.

Hammack & Hammack for Appellant.

Morris Lavine for Respondent.

WILSON, J.—This is an appeal from a judgment denying appellant's petition for family allowance and her petition for termination of family allowance to Grace Zerbe Cooper.

Both appellant and respondent claim to be the lawful widow of decedent who left a will in which he appointed Grace Zerbe Cooper as his executrix and devised to her all his property. The trial court allowed her a family allowance as the surviving widow.

Decedent and appellant were married in New Jersey on January 10, 1910. They established their home in New York City where he practiced law. Decedent left New York about a year later, leaving his wife in New York, and went to Texas where in the same year he married for a second time. He left Texas shortly thereafter and came to Los Angeles. During World War I he enlisted in the United States Army, later transferring to the British Army, and while he was in England in 1919 his second wife filed suit and obtained a divorce from him in Los Angeles.

After the Armistice decedent returned to New York and lived for a time with appellant. He then proceeded west and established himself in the practice of law in Los Angeles. He married for a third time in Los Angeles but his third wife, Carolyn, was burned to death in 1926. In about 1928 decedent established a home in Los Angeles with respondent and on October 5, 1929, they were purportedly married under the provisions of section 79* of the Civil Code. Decedent and respondent continued living together in Los Angeles until his death in 1948.

As grounds for reversal appellant contends that (1) she has sustained the burden of proving that she and decedent had never been divorced, (2) in any event the purported marriage between decedent and respondent was not a legal marriage since the requirements of section 79 of the Civil Code were not complied with, and (3) the court erred in admitting

---

*Section 79 reads: "When unmarried persons, not minors, have been living together as man and wife, they may, without a license, be married by any clergyman. A certificate of such marriage must, by the clergyman, be made and delivered to the parties, and recorded upon the records of the church of which the clergyman is a representative. No other record need be made."

into evidence a certified copy of the records of the county recorder as evidence of the marriage between decedent and respondent.

Respondent contends that appellant has failed to sustain the burden of proof that decedent had not obtained a divorce from her, citing *Marsh* v. *Marsh,* 79 Cal.App. 560 [250 P. 411], and *Estate of Hughson,* 173 Cal. 448 [160 P. 548].

Appellant testified that decedent told her when he returned to New York after his discharge from the service that he had never obtained a divorce from her; that he went to California to establish himself and wanted her and their child to join him as soon as possible; he did not, however, send her the money to come to California; in 1923 when she and decedent were together in Toledo, Ohio, where he had gone from Los Angeles to try a lawsuit, decedent told her he had married Carolyn but that he had never divorced appellant; that he was going to break off with Carolyn upon his return; that he wanted to put things right and appellant could come to the coast; that she came to California in 1925 and lived with him about two months and at that time he reiterated there had never been a divorce between them; again in 1927 she came to Los Angeles for a short time at which time he repeated there had never been a divorce; she never saw decedent again after 1927 and first learned of his death from a newspaper clipping she received from her sister-in-law; she did not know he had married respondent.

As proof of her assertion that she and decedent were never divorced, appellant offered in evidence letters which she had received from him between the years 1919 and 1944. In February, 1919, decedent wrote her from England and suggested she discuss with a member of the firm by which she was then employed the possibility of a connection for him. In this letter he states: ''tell them that your husband is an American lawyer and that through a misunderstanding we separated . . . that we have cleared our misunderstanding up and are going back together . . .'' In another letter he stated that he felt better than he had ever felt in his life and that there ''seems to be a load taken off my shoulders that I have been carrying for years—for now I feel that I am doing the right and honorable thing by com*m*ing back to you . . . Everything's seems rosy—now that all the strain is over—I am com*m*ing back my life *j*uring the past eight years hasn't been a bed of roses but—I have had a lot of experience and—am a

much wiser man for it . . .'' This letter was apparently written about the time decedent's second wife divorced him.

In 1923, when decedent went to Toledo to try a lawsuit, he wrote appellant urging her to join him there. According to his letters written after his return from Toledo, he separated from Carolyn but later went back to her. His letters indicate he had placed himself in a situation from which he was unable to extricate himself and he was fearful of a public scandal. He separated from Carolyn again in 1925 and appellant came to Los Angeles. After her return to New York decedent wrote her, in response to a letter from appellant, that the word which seemed uppermost in all the letters was ''divorce''; that he was not interested in the matter at all; that if the family wanted her to get a divorce she should get it in New York; he did not want her to get a divorce in Los Angeles because of the scandal. Decedent wrote: ''As for you being in Los Angeles I told you and me_nt it that I liked to have you here better than I did to have you in New York and the past few weeks have proven just how unpleasant and uncertain it is when you are away. So why not go ahead and get a divorce in New York. and let matters straighten themselves out here. and when you have sati_fied everybody you and I will be in a pozition to do just as we please and we can go off to ourselves and let the rest of the world go bye.

''Now I hope I have made myself clear—as I tried to do when you were here. as for your comming out here to try matters and if after staying here a year they are not entirely to your liking then to get a divorce—I don't just exactly understand what the object is—you know the conditions out here and my proposition. and that is that we are already divorced. if you want to come here I welcome you, and if after staying here we want to live together we will—and if necessary to remarry we will—and that is the only proposition I have to make . . .

''So try and reason the matter out yourself and do just what you think is best—and I will agree to anything you say except you getting a divorce here.

''From the legal side—you would require a years residence here and new grounds—because you lived with me here. And shurely I would be a boob to give you the grounds upon which to ruin me here. so why think of such a thing.

''But if you want a New York divorce, just go ahead as if you had never been out here and name who you want to.''

In 1928 decedent wrote appellant that as he understood her offer, he was to give her $5,000, she was to obtain a divorce and then he would be at liberty to do as he pleased. He stated: "As to the divorce why do you want one. You say I never obtained one and therefore you want it—may I ask for what purpose—you say you do not intend to marry—then why the divorce." He suggests they go on the same way they had been doing for 18 years.

In 1932 appellant retained an attorney in Los Angeles. The attorney wrote her that he had talked with decedent over the telephone and that "He declines to state whether he got a divorce from you or not and declines to give me the name of the county where it was obtained, if it was obtained. He refuses to either affirm or deny that he is married to you and says that it is a purely personal matter between you and him and that he intends writing you a personal letter . . . Personally, I am convinced from his conversation over the phone that he never procured a divorce."

Decedent wrote appellant the following day and told her of his conversation with her attorney. He stated that he was too old to seek other employment and if he were denied the right to practice law "from publicity or otherwise" he would be through and she knew it; that he regretted the mistakes he had made and whether he made more seemed to be up to her. In May, 1932, decedent wrote her that they had "hashed and rehashed" the matter until there was nothing left to talk about; that the last time she was in Los Angeles she came with the intention of staying and obtained an apartment but that it did not work, that she went back and at the time they agreed "one and all and forever that the matter was a closed book" and he was to go his way and she was to go hers; that if her desire at that time was to ask him to disappear off the face of the earth, resign from the practice of law, go to jail or suffer any other disgrace, she should write him just what she wanted; that he had been living just from hand to mouth for the past year but with additional effort he could get along and straighten out the "tangeled mess" he was in.

Appellant testified that she wrote every county in Texas and was advised decedent had not obtained a divorce. There is no evidence in the record that decedent lived anywhere in Texas except Amarillo and there is in evidence a letter from the county clerk of Potter County that decedent did not obtain a divorce in that county. Appellant also testified that she had written the Hall of Records in Los Angeles in 1931

or 1932 and was informed there was no record of a divorce.

Respondent contends that appellant has failed to sustain the burden of proof since she did not search the records in various places where decedent lived; that he lived in England, New York, New Jersey, Texas, Illinois, Nevada, Tennessee, Ohio and California. There is in the record no evidence that decedent resided anywhere in California except Los Angeles County, nor is there any evidence that he resided in Ohio, Nevada or Illinois. There is no evidence of his residence in Tennessee after his marriage to appellant in 1910. His residence in New Jersey and New York was at a time when he was living with appellant and his residence in England was during the time he was in the service and following which he lived with appellant.

Appellant testified that at the time of trial she was getting a pension from the United States government as the unremarried widow of decedent and that during his lifetime she received half of his pension.

■ The correspondence referred to above, together with numerous other letters written by decedent to appellant over a period of years, and which are in evidence, are substantial proof that he never obtained a divorce from her; that having remarried without terminating his first marriage he was constantly worried over the possibility of her filing suit for divorce in Los Angeles and that such action on her part would reflect upon his reputation and ruin him in his practice; that he was very much afraid of having anyone in Los Angeles know that they had not been divorced and for that reason he even went so far as to suggest that if she decided to come to Los Angeles and live with him they remarry if necessary so the truth would not be known. These letters together with the evidence that appellant had been receiving half of his pension, which must have been with decedent's knowledge, and that he had continued sending her money even after his child became of age are sufficient to sustain the burden of proof cast upon her that decedent had not obtained a divorce from her and to overcome the presumption of validity of the subsequent marriages.

■ Appellant asserts that in any event the marriage between decedent and respondent was not legal since there is no evidence of compliance with the provisions of section 79 requiring that the marriage be recorded upon the records of the church; that the statutory provisions relative to solemnization

and authentication of marriages are mandatory. This contention is untenable since section 68 of the Civil Code expressly provides that noncompliance with the provisions by others than a party to a marriage does not invalidate it.

As proof of her marriage to decedent respondent introduced into evidence over the objection of appellant a certified copy of the records of the county recorder.* This document was recorded upon the acknowledgment of Grace Z. Kirham Cooper, which acknowledgment is dated December 6, 1933. Section 79 of the Civil Code provides: "A certificate of such marriage must, by the clergyman, be made and delivered to the parties, and recorded upon the records of the church of which the clergyman is a representative. No other record need be made." ■ The original marriage certificate was not produced nor was any valid reason given for not producing it. Respondent testified that the original document was taken up to the recorder's office in 1933 and "it's still up there." No subpoena was served upon the county recorder to produce the original document nor does the evidence show that any search was made of the files of the county recorder or for Willedd Andrews, who had requested that the document be recorded. Also, although counsel for respondent stated that the clergyman who performed the marriage ceremony was available and that he would produce him as a witness, he failed to do so.

Section 10551 of the Health & Safety Code provides: "Any

---

*                CERTIFICATE OF MARRIAGE

WHEREAS, John S. Cooper and Grace Z. Kirkham, both of Los Angeles, California, being unmarried and not minors and having been living together as man and wife and having taken the bonds of matrimony before me a Clergyman of the American Church, I hereby unite them in matrimony under the provisions of Section #&79 of the Civil Code of the State of California. Los Angeles, Cal., Oct. 5th, 1929.

Frank Dyer, D.D.

John S. Cooper
Grace Z. Kirkham

State of California, County of Los Angeles, ss. On this 6th day of December, 1933, before me, CHAS. D. MUNRO, a Notary Public in and for the said County and State, personally appeared Grace Z. Kirham Cooper,—known to me (or proved to me on the oath of Willedd Andrews) to be the person whose name is subscribed to the within instrument, and acknowledged to me that she executed the same.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal the day and year in this certificate first above written.

(Notarial Seal)   Chas. D. Munro, Notary Public in and for said County and State. My commission expires February 9, 1937 #556. Copy of original recorded at request of WILLEDD ANDREWS Dec. 6, 1933. 9:46 A.M. Copyist #27 Compared C. L. Logan, County Recorder, by E. K. Perkins (35) Deputy.
$1.00—3.S.

photostatic copy of the record of a birth, death, or marriage, or a copy, properly certified by the State or local registrar to have been registered within a period of one year from the date of the event is prima facie evidence in all courts and places of the facts stated in it.'' The purported certificate of marriage was not registered within one year from the date of the marriage but four years thereafter. Moreover, the recordation was upon the acknowledgment of Grace Cooper and not that of the minister who performed the marriage. For the several reasons above stated it was error for the court to admit the document.

Respondent contends that under no circumstances is appellant entitled to a family allowance since she was not a member of decedent's family at the time of his death.　██　The court, having found that Grace Zerbe Cooper is the widow of decedent and that Mabel Cooper is not, gave no consideration to the latter's application for such allowance. The granting of an allowance is dependent upon the wife's right to support at the time of her husband's death. (*Estate of Brooks,* 28 Cal.2d 748, 755 [171 P.2d 724].) Upon a retrial it will be the duty of the court to admit and consider evidence as to whether the separation of appellant and decedent was caused by the latter's acts or whether it was by agreement between the parties and any other proffered evidence relating to appellant's right to support at the time of decedent's death.

Judgment reversed.

Moore, P. J., and McComb, J., concurred.

A petition for a rehearing was denied May 11, 1950, and respondent's petition for a hearing by the Supreme Court was denied June 23, 1950. Carter, J., and Schauer, J., voted for a hearing.